## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

NOREEN A. BUNDSCHUH,

                              Plaintiff,

    v.                                                      DECISION and ORDER

THE INN ON THE LAKE                                    09-CV-6037-CJS
HUDSON HOTELS, LLC,

                              Defendant.

_____

### APPEARANCES

For Plaintiff:                      Steven Laprade, Esq.
                                    Christina A. Agola, PLLC
                                    1415 Monroe Avenue
                                    Rochester, NY 14618

For Defendants:                     Scott D. Piper, Esq.
                                    Harris Beach PLLC
                                    99 Garnsey Road
                                    Pittsford, NY 14534

### INTRODUCTION

**Siragusa, J.**  This is an action alleging hostile work environment, retaliation, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the New York State Human Rights Law ("HRL"), N.Y. EXEC. LAW §§ 296 *et seq.*  Now before the Court is Defendant's motion for summary judgment, filed February 22, 2010, ECF No. 14, and motion to opt-out of Alternative Dispute Resolution ("ADR"), filed October 5, 2012, ECF 27.  The application for summary judgment is granted, and the request to opt-out is denied as moot.

**BACKGROUND**

Unless otherwise noted, the following are the facts of this case, viewed in the light most favorable to Plaintiff.  Plaintiff worked for the Inn on the Lake[1] ("Inn") as its Director of Sales and Marketing from May 1, 2006, to July 5, 2007.  The 134-room Inn is a largely seasonal resort, with its "busy season" lasting from Memorial Day to Labor Day.  Christopher Burns ("Burns"), the Inn's Managing Director, is the person who interviewed Plaintiff, reviewed the position requirements with her, and offered her a position as one of five Directors reporting directly to him.  All Inn personnel, including Burns, ultimately are answerable to the President and Chief Executive Officer of Canandaigua Hotel Corporation, Tom Blank.

Plaintiff supervised a three-person staff responsible for booking business and social events at the Inn's facilities.  This involved calling on existing and potential clients, reserving blocks of rooms and hotel facilities, overseeing the preparation of contracts, and coordinating with others, such as the Director of Food and Beverage and the Director of Hotel Operations, to ensure that the requested facilities were available and to oversee the execution of events.  Plaintiff was the Inn's only female director.

Early in her tenure, Inn employees complained that Plaintiff was heavy-handed and demanding, and Burns describes her as having a "prickly personality."  Burns Aff. ¶ 10.  In or about August 2006, Burns spoke to Plaintiff, in the presence of Food and Beverage Director Walt Berkstresser ("Berkstresser"), and advised that she needed to be more cooperative with Burns and her co-workers, and less heavy-handed with subordinates.  *Id*.

---

[1]  The 134-room Inn is owned by a subsidiary of HHC Hotel Group, LLC, a holding company.

¶¶ 10-11. According to Burns, he was required to discuss Plaintiff's heavy-handedness with her on several other occasions, including in approximately January 2007, when one of Plaintiff's staff, Judy White, broke down in tears over difficulties she had dealing with Plaintiff.  *Id.* ¶¶ 12-14.

For her part, Plaintiff felt that Burns belittled and humiliated her.  In late summer 2006, Plaintiff felt "belittled" by Burns when the two met with a local trade organization. After the meeting, she went to Roger Miller ("Miller"), the Inn's Director of Finance, who also administers corporate HR policy at the Inn, and asked who she could speak to about human resources issues.  Miller gave her the phone number for Wendy Blank, the Inn's corporate HR Director.  Plaintiff opted not to call Blank at that time.  Pl's Dep., 46:4-20. She did not contact Blank until June 8, 2007, when she left a voicemail asking that the HR Director return her call.  In the meantime, she continued to approach Miller with grievances about her treatment by Burns.  Plaintiff states that she repeatedly told Miller that Burns was treating her differently because she was a female, Pl's Dep. 202:11-23, a claim Miller calls "absolutely incorrect," Miller Reply Aff. ¶¶ 11-12.  There were no witnesses to Plaintiff's and Miller's discussion.

After Plaintiff's first meeting with Miller, Burns called an emergency Directors' meeting.  During the meeting, Burns "yelled" at Plaintiff for wanting to call CEO Tom Blank, questioned why he hired her, and stated he could not trust her.

As a Director who attended regular meetings with both of them, Miller observed that "Plaintiff and Mr. Burns generally did not communicate well with one another."  Miller Reply Aff. ¶ 19.  Miller describes Burns as occasionally having a "rough style," and as someone who did not hesitate to single out a particular Director—"as virtually all of the Inn's Directors

have been on occasion"—and criticize him or her for making a mistake.  *Id*.  ¶¶ 7-9.

Berkstresser offered a similar view, noting that Burns criticizes the performance of

individual Directors during meetings in a way that can be "embarrassing and unwanted,"

such as his recent reference to Berkstresser as a "crybaby."  Berkstresser Reply Aff. ¶ 8.

Berkstresser describes Burns as having "frequently" criticized Director of Hotel Operations,

Mike Reinhard, due to performance problems until his termination, in December 2007.  *Id*.

¶ 9.  Miller opines that Plaintiff's mistakes stood out at their meetings because no other

Director during her tenure made mistakes of a sort that cost the Inn significant amounts of

money, as Plaintiff's did.  Miller Reply Aff.  ¶ 8.

Plaintiff describes certain incidents, occurring after she first spoke with Miller, which

she believes were harassing and/or retaliatory.  These the following: Burns: approved her

taking her sales team to dinner for reaching a goal, but later questioned the bill and

delayed paying it; Burns directed her to discuss with Food and Beverage Director

Berkstresser the various events that she arranged; Burns became upset with her for

booking an expensive band during the off-season; Burns assigned her to work on a project

beyond her job responsibilities and then marched into her office when she experienced

challenges with the project; Burns indicated he wanted all of the Directors to lie about

underage drinking at an employee event; Burns took an event away from her and assigned

it to one of her subordinates; Burns gave her the "silent treatment;" Burns called her last

for, or excluded her from, director meetings; and Burns unfairly disciplined her.  Pl's Rule

56 Counter Stmt.¶¶ 39-152.   To the extent necessary, these various actions will be

discussed more fully below.

During her tenure, Burns addressed a number of performance-related issues with Plaintiff.   In September 2006, at the end of the Inn's busy summer season, Burns requested that Plaintiff begin making outside sales calls to local businesses over the next six weeks, advise him how many calls she could reasonably make per week, and provide him with a call summary at the end of each day.  At some point in December 2006, Burns met with Plaintiff at his desk in the Inn's lobby to express his disappointment at the level of her outside sales activities and to again advise her that she needed to actively start doing sales calls.  Pl's Dep. 56:14-57:25.  Burns sent Plaintiff a follow-up email, dated December 21, 2006, "to put this in writing so there is no misunderstanding."  He then set out a detailed call schedule for Plaintiff, explaining that "[t]his is the only way we can pick up new business in the first quarter when we badly need it."  Burns thanked Plaintiff for her hard work, and assured her the sales calls "will pay off in spades."  Def's Rule 56 Stmt., Ex. C.  Plaintiff disagreed with Burns' approach, and believed his comments were unfair, because as "director of the department, [she] was trying to make the best decisions for the department and the hotel.  If [she] needed to be in the office to assist [her] team, that was more important."  Pl's Rule 56 Stmt. 62:3-7, 63:21-64:2.

At-will Inn employees, such as Plaintiff, are subject to a progressive discipline program that incorporates both verbal and written warnings.   Written warnings are administered on Personnel Action Forms ("PAFs") which are placed in the employee's personnel file.  During the course of her employment, Plaintiff received four PAFs.  The first, dated January 12, 2007, related to an error Plaintiff made in September 2006, when she booked a banquet event for Latinas Unidas, a charitable organization.  Plaintiff did not put pricing information on the order submitted for the event and, afterward, the organization

disputed the bill, stating they did not know the event would cost so much.  Def's Rule 56 Stmt., Ex. F.  The Inn ultimately was able to collect only half of the disputed bill, which cost it approximately $3,200.00.  Burns met with Plaintiff on January 12, 2007, to discuss the matter and give her the PAF.  Plaintiff did not dispute the error and signed the written warning.

The next PAF, dated June 8, 2007, related to a singles dating event Plaintiff arranged for May 11, 2007.  This warning was issued because she did not enter the event into the datebook kept by the Inn to track upcoming functions, and did not complete a Banquet Event Order until the day before the event, necessitating a hasty set-up.  *Id*. Ex. G.  Plaintiff explained to Burns that she had entered the event in the book a month or two prior, but that the client called and cancelled due to a low response, so she removed it. After the client left a late night message two days before the event to say it would, in fact, go forward,   Plaintiff prepared the BEO.  Pl's Dep. 115:5-116:8, 117:16-118:8. Nevertheless, Burns issued the PAF, stating "[w]hat we don't understand is why a tentative BEO was not issued in our May 9 staff meeting as the event was advertised in the newspaper a week before."  Def's Rule 56 Stmt., Ex. G.  Plaintiff refused to sign this PAF due to her disagreement with Burns' final comment that "[t]his gives the appearance that the singles dating event may be for [Plaintiff's] personal benefit as she attends them."  *Id*., Pl's Dep. 118:21-119:7.

A third PAF also was issued to Plaintiff on June 8, 2007, due to her failure to submit sales reports to Burns, as he had requested.  Plaintiff signed this PAF, noting that she had organized a sales blitz on March 20th which generated a minimum of three contracted events.  Def's Rule 56 Stmt., Ex. E.  She did not dispute her failure to submit call reports after November 2006.

According to Plaintiff, the two PAFs she received on June 8, 2007, were issued in retaliation for an anonymous letter Burns believed she had written.  The circumstances were as follows.  Burns organized an employee morale-boosting event to be held on May 20, 2007, in advance of the busy summer season.  All Inn employees were invited and the event featured food, a bar, and live music.  After the party, a 20-year-old Inn employee was stopped by police and cited for public intoxication.  Approximately a week to ten days later, Tom Blank, Tony Gullace, who operated a restaurant on Inn property, and Richard Sands, the President and CEO of Constellation Brands, Inc., each received an anonymous letter written by an individual purporting to be an Inn employee.  The writer was "appauld [sic] and disgusted by what happened at Sunday's employee pep rally" and opined that "[u]nattended alcohol, drinking games and under-aged drinking is a poor example of good management practices."  *Id*. Ex. H.  Plaintiff denies writing the letter and denies knowing who did.  Burns nonetheless came to believe Plaintiff was the author because she had used the word "appalled" in conversations about the party, and because the letter was signed "respectfully," which is the closing Plaintiff uses in all her emails and letters.  At the next Wednesday staff meeting after the letter came to light,[2] Burns "told the entire team

---

[2]  Plaintiff does not recall the date, but this Court notes that, based on the undisputed timeframe given, the meeting would have occurred on May 30 or June 6, 2007.

there was a rat among us," and he "was going to find out who did this," while looking directly at Plaintiff.  Pl's Dep. 174:19-176:14.  On June 8, after receiving the two PAFs, Plaintiff called and left a voice mail for Ms. Blank, the corporate HR Director.  Immediately after June 8, Plaintiff began looking for another job.  *Id*. 232:18-22.

Ms. Blank returned Plaintiff's call the following Monday, June 11, 2007, and arranged to meet with Plaintiff the next day.  The June 12 meeting lasted five-and-a-half hours, during which Plaintiff detailed the difficulties she had with her employment.  Plaintiff stated she felt Burns exposed her to a hostile work environment and "harassed" her by humiliating her in front of the other Directors after she sought an HR contact number from Miller, giving her the "silent treatment," failing to praise photos she had taken to pair with a fishing package advertisement, and insinuating at the June 6 staff meeting that she was a "rat."  Ms. Blank advised Plaintiff she would be turning the matter over to Tom Blank, and relayed the substance of Plaintiff's complaints to him the following day.  Ms. Blank followed up with Plaintiff on June 15 to advise that Tom Blank had met with Burns that day, and would be coming to the Inn to interview other employees.  Blank Aff. ¶ 28; Def's Rule 56 Stmt., Ex. K.  On June 19, Ms. Blank again updated Plaintiff "with respect to the next step in the process of assisting with a resolution to the employment-related problems you are experiencing" and advised that an individual from VitalWorks, with whom Plaintiff was comfortable, would be engaged to conduct "development/coaching sessions" with Plaintiff and Burns.  Def's Rule 56 Stmt., Ex. L.  VitalWorks is a workforce development consulting firm the Inn had previously retained to study employment relations and offer recommendations.  In the meantime, Tom Blank continued his investigation by interviewing the Inn's other Directors and Plaintiff's subordinates on June 20 and 21.

Plaintiff's fourth PAF is dated June 25, 2007, and was written after she admitted lying to a client.  Plaintiff told Xerox rooms were available for a business function it wished to book, and signed a contract on behalf of the Inn.  In fact, the rooms already had been booked by another organization.  After becoming aware of the double-booking, Plaintiff untruthfully told Xerox the rooms were not available because they had been damaged in a windstorm.  When Xerox learned of the falsehood, the Inn was required to place the group at another facility, and compensate Xerox for the difference in room rates and food and beverage costs.  The total loss to the Inn was approximately $8,900.00.  As a consequence, Plaintiff was placed on a 90-day probation.  The PAF also confirmed the prior decision that she and Burns would participate in a coaching session with VitalWorks.  Plaintiff signed the PAF without comment on June 27, 2007.  Def's Rule 56 Stmt., Ex. L.  On June 28, Burns sought to schedule an initial coaching session for July 10.  *Id*. Ex. M.

On July 3, 2007, Plaintiff notified Burns, by email and a letter placed in his mailbox, that she was submitting her two-week notice and would resign effective July 17, 2007.  She accepted another position in the hotel services industry later that day.  Burns accepted Plaintiff's resignation and had her escorted from the property on July 5, 2007, but continued to pay her through her notice period.

In September 2007, Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission ("EEOC").  In this action followed, which was commenced on January 26, 2009, Plaintiff claims she was subjected to a hostile work environment, disciplined in retaliation for her complaints regarding her treatment, and constructively discharged.

On February 22, 2010, Defendant filed the subject summary judgment motion in which it maintains Plaintiff cannot show that the allegedly harassing behavior was "because of" her sex or sufficiently severe or pervasive to constitute a hostile work environment, that she suffered an adverse employment action under circumstances giving rise to an inference of retaliation, or that she can establish a *prima facie* claim of constructive discharge.   Plaintiff disagrees, and contends she has made a sufficient *prima facie* showing as to each of her claims, and also shown that any purportedly legitimate reasons offered by Defendant are pretextual.   Defendant submitted a reply, contesting each of Plaintiff's arguments.   Counsel appeared on November 4, 2010, for oral argument.

## DISCUSSION

### *Rule 56*

The standard for granting summary judgment is well established.   Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A party seeking summary judgment bears the burden of establishing  that no genuine issue of material fact exists.   *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).   "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied."   11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.).   "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim."   *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986)), *cert. denied*, 517 U.S. 1190, 116 S. Ct. 1678, 134 L. Ed. 2d 780 (1996).

The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question.  Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, could show discrimination."  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotations omitted).  However, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S. Ct. 91, 88 L. Ed. 2d 74 (1985).

### *Title VII and the HRL*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"  *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir. 1999) (citations omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461

F.3d 199 (2nd Cir. 2006).   "Title VII is not a general civility code for the American workplace; it prohibits only harassment that is discriminatory."   *Marshall v. NYC Bd. of Elections*, No. 07-4561-cv, 322 Fed. Appx. 17, 2009 WL 928083 at *19 (2d Cir. Apr. 7, 2009) (citation and internal quotation marks omitted).

It is well settled that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII."   *Torres v. Pisano*, 116 F.3d 625, 629, n.1 (2d Cir. 1997), *cert. denied*, 522 U.S. 997, 118 S. Ct. 563, 139 L. Ed. 2d 404 (1997). Consequently, unless otherwise noted, references to Title VII below are also intended to refer to the HRL.

### Hostile Work Environment Claim

The legal standards for a hostile environment claim are well settled:

> In order to establish a hostile work environment claim ... a plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. A hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive. The plaintiff must show more than a few isolated incidents of [ ] enmity [based on a protected category], although a hostile work environment can also be established through evidence of a single incident of harassment that is extraordinarily severe.

*Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 723-724 (2d Cir.2010) (citations and internal quotation marks omitted) (alterations added); *see also, Fitzgerald v. Henderson*, 251 F.3d 345, (2d Cir. 2001) ("If a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of lack of an adverse employment decision is inappropriate.").

A plaintiff may, but is not required to, demonstrate that she suffered a tangible employment action as part of a hostile environment claim. *See*, *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (indicating that a hostile environment can be proven, "notwithstanding the fact that the employer takes no tangible employment action").

In a sex discrimination action such as this, the female plaintiff must prove that the hostile environment was based on her gender:

> It is axiomatic that to prevail on a claim of hostile work environment based on gender discrimination, the plaintiff must establish that the abuse was based on her gender. The harassing conduct need not be motivated by sexual desire, however, so long as it was motivated by gender. Further, facially neutral incidents may be included among the "totality of the circumstances" that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory. Circumstantial evidence that facially sex-neutral incidents were part of a pattern of discrimination on the basis of gender may consist of evidence that the same individual engaged in multiple acts of harassment, some overtly sexual and some not. In *Raniola* [*v. Bratton*, 243 F.3d 610 (2d Cir. 2001)], for example, we concluded that, given proof of instances of overt gender hostility by the supervisor of the female plaintiff, a rational juror could permissibly infer that his entire alleged pattern of harassment against her was motivated by her gender, even though some of the harassment was not facially sex-based. Thus, the relevant circumstances in *Raniola* included not only offensive sex-based remarks, but also, *inter alia*, one dire facially gender-neutral threat of physical harm by the supervisor who had made those remarks. In *Fitzgerald v. Henderson*, 251 F.3d 345 (2d Cir.2001), *cert. denied*, 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002), we held that a claim of gender-based hostile work environment (as well as an "embedded" claim of retaliation) may be premised on evidence that a supervisor heaped abuse on the plaintiff because she had rejected his sexual advances. *See* 251 F.3d at 361[.] So long as there is some evidentiary basis for inferring that facially sex-neutral incidents were motivated by the plaintiff's gender, the ultimate question of whether such abuse was "because of" the plaintiff's gender . . . is a question of fact for the factfinder.
>
> In sum, the question of whether considerations of the plaintiff's sex caused the conduct at issue often requires an assessment of individuals' motivations and state of mind, and an invidious discriminatory purpose may often be

inferred from the totality of the relevant facts. Thus, especially in the context of a claim of sexual harassment, where state of mind and intent are at issue, the court should not view the record in piecemeal fashion, and summary judgment should be used sparingly.

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 547-548 (2d Cir. 2010) (emphasis added, citations and internal quotation marks omitted).

In this case, Defendant first argues that Plaintiff cannot show the alleged hostile environment she experienced was related to her gender.  The Court agrees.  Construing the facts in a light most favorable to Plaintiff, Burns began his hostile actions toward her not long after her hire, although he was the individual who interviewed her and decided to extend the offer of employment.  Plaintiff does not identify any sex-based comments or conduct by Burns over the entire course of her employment.  The claim that he treated her harshly "because of" his enmity against women is premised on the fact that, of the five Directors reporting to Burns, she was the only female.  This alone is not a sufficient basis from which to infer that the facially-neutral conduct of which Plaintiff complains—*e.g.*, Burns being overly-critical, issuing progressive discipline, requiring that she communicate with other Directors, requiring that she take on tasks outside her job description, and the like—was, in fact, discriminatory.

Moreover, Plaintiff's inferences notwithstanding, it is apparent from the record that her male counterparts also were subjected to Burns' "embarrassing and unwanted" critiques.  Berkstresser Reply Aff. ¶¶ 8-9.  Indeed, in her lengthy meeting with Ms. Blank, Plaintiff described in detail an emergency Director's meeting held in May 2007 in which Burns openly questioned Director Reinhard's leadership and made it "very unpleasant for him."  Blank Aff. ¶ 13.  In the field of employment discrimination, the term "hostile" work

environment has a particular meaning in that it relates only to discriminatory conduct.

> [It] is not synonymous with an unpleasant, harsh, combative or difficult work environment.  The nation's workplace is most likely populated with abusive, banal, profane, and vulgar supervisors....   Although Title VII protects employees from improper discriminatory intimidation, it does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors.

*Benette v. Cinemark U.S.A., Inc.*, 295 F. Supp. 2d 243, 250 (W.D.N.Y. 2003) (citations, internal quotation marks and alteration omitted).  Since the record does not suggest Burns' conduct toward Plaintiff was "because of" her gender, there is no need to consider Defendant's further argument that the conduct was not sufficiently severe and pervasive to constitute a hostile work environment.

### Retaliation Claim

The legal principles applicable to retaliation claims are as follows:

> "Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis.  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  First, the plaintiff must establish a prima facie case of retaliation by showing: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'"  *Jute*, 420 F.3d at 173 (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir. 2001)).  The plaintiff's burden in this regard is "*de minimis*," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id*. (internal quotation marks omitted).

> If the plaintiff sustains this initial burden, "a presumption of retaliation arises." *Id*.  The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id*.  If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id*.  A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were

objectively valid grounds for the [adverse employment action]." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

*Hicks v. Baines*, 593 F.3d 159, 164-165 (2d Cir. 2010).

Here, Defendant argues Plaintiff has not made a *prima facie* showing because she did not participate in protected activity prior to June 12, 2007 (the date she met with Ms. Blank), all conduct she complains of other than her final PAF is not adverse, and she has conceded there is no causal connection as to some conduct, even if it could be construed as adverse.

### *Protected Activity*

A plaintiff engages in "protected activity" when she (1) opposes employment practices prohibited under Title VII; (2) makes a charge of discrimination; or (3) participates in an investigation, proceeding or hearing arising under Title VII.  42 U.S.C. § 2000e-3(a); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  "'[P]rotected activity' [ ] must relate to an alleged violation of Title VII, *i.e.*, the complaints must relate to . . . gender.  Otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her employment would ultimately find relief in Title VII even when . . . gender was not an issue." *Kelly v. Howard I Shapiro & Assocs. Consulting Eng'rs, P.C.*, No. 11-CV-5035 (ADS) (AKT), 2012 U.S. Dist. LEXIS 110935, at *36-37 (E.D.N.Y. Aug. 3, 2012) (citation and quotation marks omitted).

It is undisputed on this record that, beginning in or about late summer 2006, Plaintiff took various complaints about her interactions with Burns to Roger Miller, who is responsible for administering HR policy at the Inn, including fielding employee complaints and offering input on the steps an employee should take next.  Miller Reply Aff. ¶ 3.

Plaintiff attests that she repeatedly told Miller she believed she was treated differently because she is female, a statement Miller forcefully denies.   Defendant maintains that Plaintiff has failed to make out her *prima facie* case because Miller disputes her testimony and, in any event, Miller was simply a co-worker and not a proper individual to approach with her complaints.   Neither argument is persuasive on this record and Plaintiff has met her *de minimus* burden with regard to protected activity.

### Materially Adverse Action

To make a *prima facie* showing of an adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   *Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d at 207 (quoting *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006)).   Conversely, "petty slights or minor annoyances that often take place at work and that all employees experience" do not constitute actionable retaliation.   *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. at 68.   The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.

Defendant argues that virtually all of the conduct Plaintiff complains of involved the kinds of minor slights and annoyances that commonly arise from personality conflicts in the workplace, and so are not materially adverse.   Def's Mem. in Supp. of Mot. for Summ. J. at 15-16.    In response, Plaintiff contends that, after she first spoke with Miller, Burns retaliated against her by continuing to belittle and berate her and by issuing two inaccurate PAFs on June 8, 2007.   Pl's Mem. in Opp.  at 13.   Plaintiff recites the conduct of which she

complains,[3] but does not provide context, argument, or authority in support of her assertion

that the actions were *materially* adverse—*i.e.*, would have dissuaded a reasonable person

from pursuing his or her statutory rights.

Assuming, for purposes of this motion, that Plaintiff engaged in protected activity in

August 2006, the Court finds Burns' actions after that date—other than the alleged false

disciplinary write ups—fall into the category of "trivial harms" that are not likely to deter a

reasonable employee from making a complaint.  This is so whether the actions are viewed

individually or collectively.  *See, e.g., Tepperwien v. Entergy Nuclear Operations, Inc.*, 663

F.3d 556, 571 (2d Cir. 2011) (supervisor's empty verbal threats, comment and staring

during employee meeting, and public yelling directed at plaintiff are nonactionable slights

that do not cause harm); *Cody v. Cnty. of Nassau*, 345 Fed. App'x 717, 719 (2d Cir. 2009)

("(1) falsely accusing [plaintiff] of being absent without authorization, (2) threatening her

with future counseling notices and disciplinary actions, (3) writing her up for leaving work

early, (4) placing her on a medical review list, (5) issuing her a counseling notice while she

was on leave, and (6) engaging in a pattern of conduct that created a hostile working

environment" were not adverse actions for purposes of a retaliation claim); *Dillon v.

Morano*, 497 F.3d 247, 254 (2d Cir. 2007) (assignment of additional tasks and exclusion

from certain staff meetings not materially adverse); *Workneh v. Pall Corp.*, 2012 U.S. Dist.

LEXIS 147397, at *30-32 (E.D.N.Y. 2012)  (assignment of additional responsibilities,

scrutiny of plaintiff's job performance and daily schedule, and increased scrutiny of charges

to corporate card not adverse employment actions); *Hall v. New York City DOT*, 701 F.

---

[3]  Plaintiff contends that all conduct by Burns occurring after August 2006 is retaliatory.  Those alleged incidents are set out above, and need not be repeated here.

Supp. 2d 318, 336 (E.D.N.Y. 2010) (holding that reprimands and close monitoring may cause embarrassment or anxiety, but these intangible consequences are not materially adverse);  *Monroe v. Xerox Corp.*, 664 F. Supp. 2d 235, 245 (W.D.N.Y. 2009) (supervisor's general antagonism not materially adverse); *Wallace v. New York Stat Dep't Corr. Servs.*, 2006 U. Dist. LEXIS 51863, at *27 (W.D.N.Y. July 28, 2006) (allegations that plaintiff was "completely ostracized and excluded from important meetings and social events" not sufficient to establish adverse action).  Even assuming Plaintiff could prove  the incidents of which she complains occurred and that they were motivated by retaliation, no rational jury could conclude that these acts, taken together, resulted in an injury or harm that would dissuade a reasonable worker from making or supporting a charge of discrimination. Notably, Plaintiff attests that Burns' actions did not dissuade her from making a number of subsequent complaints about him to Miller and Ms. Blank.  *See Jantz v. Emblem Health*, 2012 U.S. Dist. LEXIS 14977, at (S.D.N.Y. Feb. 6, 2012) ("The Second Circuit has instructed that while the test [for a materially adverse action is] objective, it remains relevant whether the plaintiff himself was deterred from complaining.") (citing *Tepperwien*, 663 F.3d at 572)).

### *Causal Connection*

As for the two purportedly inaccurate PAF's Plaintiff received on June 8, 2007, she consistently links their issuance to Burns' belief that she had written an anonymous letter critical of an employee party, and his desire to retaliate against her for her being a "rat." Assuming the truth of Plaintiff's assertions, these PAFs had nothing to do with her gender

or her purported complaint to Miller almost one year earlier, in August 2006.[4]   Accordingly, the Court finds that Plaintiff has not made a *prima facie* showing that she suffered a materially adverse action that could support a retaliation claim.

### Constructive Discharge

A constructive discharge occurs when an employer "intentionally creates a work atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily."   *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003); *see also Pa. State Police v. Suders*, 542 U.S. 129, 141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).   This requires a "further showing" beyond what is necessary to establish a hostile work environment or retaliation claim, such that resignation qualified as a fitting response.   *Suders*, 542 U.S. at 134. Whether working conditions are sufficiently intolerable to constitute a constructive discharge "is assessed objectively by reference to a reasonable person in the employee's position."   *Petrosino v. Bell Atl.*, 385 F.3d 210, 230 (2d Cir. 2004).

Defendant urges that Plaintiff cannot show Burns deliberately attempted to compel her resignation, nor that her working conditions were so objectively intolerable that she was forced to resign.   Def's Mem. in Supp. of Summ. J. at 20-22.   Plaintiff contends that for all of the reasons relied on in support of her other claims, she has sufficiently established a *prima facie* constructive discharge claim as well.   Pl's Mem. in Opp.  at 19.

Plaintiff's constructive discharge claim is predicated on precisely the same post-August 2006 incidents that give rise to her retaliation claims.   Pl's Mem. in Opp.  at 19.

---

[4]   Because Plaintiff is unable to recall even a general timeframe for any other alleged complaint to Miller, she could not establish a temporal connection to these PAFs, even if she believed they were related to a complaint of discrimination, which she does not.

"[W]here, as here, a plaintiff is claiming that [s]he was constructively discharged based upon acts of retaliation, the acts complained of must actually constitute retaliation under Title VII." *Johnson v. Potter*, 2009 U.S. Dist. LEXIS 62845, at *47-49 (W.D.N.Y. July 22, 2009) (collecting cases). As already determined, Plaintiff has not established a *prima facie* retaliation claim. And even assuming she had, she has not attempted to make the "further showing" required to support a constructive discharge claim. Thus, summary judgment as to this claim is warranted, as well.

### CONCLUSION

For the reasons stated, Defendant's motion for summary judgment, ECF 14, is granted. Consequently, Defendant's motion to opt-out of ADR, ECF 27, is denied as moot.

IT IS SO ORDERED.

Dated:   November 2, 2012
         Rochester, New York


                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Judge